Jack **GURNEE** and Fred **Blake, Appellants,**

v.

**LEXINGTON–FAYETTE URBAN COUNTY GOVERNMENT, Appellee.**

No. 1998–CA–000958–MR.

Court of Appeals of Kentucky.

March 19, 1999.

Discretionary Review Denied by Supreme Court Dec. 9, 1999.

Mark L. Miller, Louisville, KY, for Appellant.

Phillip D. Scott, Margaret A. Miller, Lexington, KY, for Appellee.

Before GARDNER, HUDDLESTON and JOHNSON, Judges.

## OPINION

JOHNSON, Judge.

Jack Gurnee (Gurnee) and Fred Blake (Blake) (collectively, the appellants), have appealed from the judgment of the Fayette Circuit Court entered on April 8, 1998, which interpreted the provisions of Kentucky Revised Statutes (KRS) 67A.520, and determined that the appellee, Lexington–Fayette Urban County Government (LFUCG), had complied with the statute. We affirm.

This appeal involves an issue of first impression relating to KRS 67A.520, the statute governing the obligation of the LFUCG to contribute to the appellants' pension fund, the Police and Firefighter's Retirement Fund of the Lexington–Fay-

ette Urban–County Government (the fund). The statute was enacted in 1974 as part of a comprehensive scheme enabling urban-county governments to establish retirement funds for its police and firefighters.[1] Upon retirement under this scheme, eligible members of the fund are entitled to receive a defined benefit equal to 2½% of their average salary for each year of service. KRS 67A.430. Active members are required to contribute a sum equal to no less than 10.5%, or no more than 11% of their current salaries, the exact percent to be determined by LFUCG. KRS 67A.510. The "responsibility for the proper operation of the fund" is vested in the eleven-member Board of Trustees made up of various officials or employees of the urban-county government,[2] the police and fire chiefs, one retired member of the fund and two active members of the fund from each department. KRS 67A.530.

KRS 67A.520, which is at issue in this case, is the provision of the scheme designed to establish the amount of LFUCG's annual obligation to the fund. This statute reads in its entirety as follows:

The government shall make current contributions to the fund on an actuarially funded basis, toward the annuities and benefits herein provided. These contributions shall be equal to the sum of the following:

(1) An annual amount resulting from the application of a rate percent of salaries of active members determined by the entry age normal cost funding method. Such rate percent shall be fixed by the board every three (3) years, within six (6) months after the actuarial study required by subsection (6) of KRS 67A.560 (actuarial survey of the fund), and shall be in effect for a period of at least three (3) years.

(2) An amount resulting from the application of a rate percent of the salaries of active members which will provide each year regular interest on the remaining liability for prior service.

(3) In any event, the total contribution of the government shall be at least seventeen percent (17%) of the salaries of the active members participating in the fund.

(4) In addition to other remedies provided by law, any member of the fund or any annuitant may obtain in the Circuit Court of any county in which the government is located an injunction or mandamus requiring the government to comply herewith.

On December 28, 1992, Gurnee, a police officer currently employed by LFUCG, and Blake, a retired police officer formerly employed by LFUCG, filed a complaint pursuant to KRS 67A.520(4). They alleged that, beginning with the fund's inception in 1974, LFUCG had violated KRS 67A.520 by failing to make its required annual contribution to the fund. The appellants sought a judgment equal to the difference between the annual contribution they alleged was required by KRS 67A.520 and the contributions actually made by LFUCG.

In its answer, LFUCG denied that it had failed to make appropriate contributions, and alleged in the alternative that KRS 67A.520 is "unconstitutional in that it is vague, overly broad and indefinite so as

---

1. The purpose of the scheme is set forth in KRS 67A.380, as follows:

   The purpose of the fund is to provide retirement annuities and disability benefits for the members of the police and fire departments who become aged or otherwise incapacitated, and widows' annuities and other benefits to the dependents of such members to the end that such members may accumulate reserves for themselves and their dependents to meet, without prejudice or hardship, the hazards of old age, disability, death, and termination of service, thereby encouraging qualified personnel to enter and remain in the service of such departments.

2. These members of the Board of Trustees include the mayor, the commissioner of public safety, the commissioner of finance and the director of personnel.

to render the statute meaningless and void." It asked the circuit court to enter a judgment declaring the statute "void and unenforceable." LFUCG notified the Attorney General of Kentucky of its challenge to the statute, but the Attorney General did not intervene to defend the statute.

After obtaining discovery, the appellants moved for summary judgment on the issue of liability. In support of their motion, they filed the deposition of their expert actuary, Charles Lynch (Lynch), who testified that KRS 67A.520 established a funding level for the fund which required an annual contribution from LFUCG equal to the sum of the current service costs under the entry-age normal cost method[3] and an amount which would provide interest on the unfunded liability.[4] In addition to Lynch's testimony, the appellants relied upon the testimony of Stephen Gagel (Gagel), an actuary, whose firm prepared many of the valuation reports of the fund for the Board of Trustees beginning in the late 1970's. Gagel testified that several times over the years he had advised LFUCG that its contributions to the fund were less than the level prescribed by the statute. Betty Pendergrass King (King), the Commissioner of Finance for LFUCG from 1983 to 1993, confirmed that from 1978 through 1993, LFUCG had not contributed to the fund at the rates recommended by actuaries hired by the Board of Trustees.

There was no dispute before the circuit court that since the fund was created in 1974, LFUCG had paid only the minimum contribution required by subsection (3) of the statute.[5] There was also no dispute that the minimum contribution had been less than the percent recommended by the actuaries employed by the Board of Trustees. Further, there was also no dispute that the Board of Trustees had not established any percentage rate to be applied to the salaries of active fund members as required in KRS 67A.520(1). Nevertheless, the appellants asked the circuit court to determine that the statute obligated LFUCG to make a contribution in excess of the minimum contribution.

In its order of April 8, 1998, the circuit court rejected LFUCG's argument that KRS 67A.520 is unconstitutional. Although the circuit court described the statute as having been "poorly drafted" and as "difficult to interpret if read literally," it opined that "a logical interpretation" was "attainable." In its determination that LFUCG had complied with the mandate of KRS 67A.520, the circuit court reasoned as follows:

> The Plaintiffs' argument that the law requires the contribution be equal to the amount set by adding subparagraphs (1) and (2) of KRS 67A.520, or using the amount stated in KRS 67A.520(3), whichever is the larger amount, may or may not be correct. However, in this case where the Board has not established the rate necessary to ascertain

3. Lynch defined "entry-age normal cost method" as follows:
   > It's a funding method that determines the contribution to the plan as a level percent of payroll, so that if the plan had been funded from each employee's date of hire, and if all actuarial assumptions have been met, then the resulting contributions would be a level percent of an increasing payroll.

4. The "past service liability" or "unfunded liability," which increased from about $28 million in 1978, to $44 million in 1993, was explained by Lynch as follows:
   > Using the entry-age normal funding method, you determine the past service liability,

the accumulation that would be on hand if all assumptions had been met and the plan had always been funded from date of hire, and then you compare that to assets and the difference, the shortfall is the unfunded past service liability.

5. The minimum contribution has increased over the years. When KRS 67A.520 was enacted, it provided for a minimum contribution by the urban county government of 12% of the salaries of active members of the fund. The percent was increased to 15% in 1980, and to 17% in 1990.

the amount due under KRS 67A.520(1) and (2), the practice of the Defendant contributing the amount stated under KRS 67A.520(3) is compliance with the statute. The issue of what would be the proper result if the Board had set the rate necessary to calculate the amount due under KRS 67A.520(1) and (2) is not presently before the Court.

This appeal followed.

■ Before addressing the merits of the issues raised by the appellants, we will discuss LFUCG's contention that KRS 67A.520 is "so ambiguous, vague and indefinite" that this Court should declare it unconstitutional. Clearly, there is a grammatical flaw in the statute in that it provides that the urban-county government shall make a contribution to the fund which is "equal to the sum" of its four subsections. It is readily apparent that the four subsections are not capable of being added together. However, it is equally apparent that the drafters intended for the government to pay an amount which equals the sum of subsections (1) and (2), or ("[i]n any event") the minimum contribution contained in subsection (3). Since Subsection (4) provides specific non-monetary remedies to members of the fund, it is not capable of being added to the preceding subsections of the statute.

LFUCG insists that if read literally, KRS 67A.520 is "nonsensical" and "illogical." It contends that it "has been forced to 'guess' the amount of contribution the General Assembly intended to require." It relies on those cases which reason that "[a] statute is vague if 'men of common intelligence must necessarily guess at its meaning.'" *State Board for Elementary and Secondary Education v. Howard,* Ky., 834 S.W.2d 657, 662 (1992), *citing Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). *See also Raines v. Commonwealth,* Ky.App., 731 S.W.2d 3 (1987).

■ It is settled in this jurisdiction that "a statute carries a presumption of constitutionality." *Commonwealth v. Halsell,* Ky., 934 S.W.2d 552, 554 (1996). "In deciding whether an act of the General Assembly of Kentucky is unconstitutional we necessarily begin with the strong presumption in favor of constitutionality and should so hold if possible." *Brooks v. Island Creek Coal Company,* Ky.App., 678 S.W.2d 791, 792 (1984). "When considering the constitutionality of a statute, we are 'obligated to give it, if possible, an interpretation which upholds its constitutional validity.'" *Halsell,* at 554–555, *citing American Trucking Ass'n v. Com., Transp. Cab.,* Ky., 676 S.W.2d 785, 789 (1984). The fact that a statute is nonsensical if read literally, or is susceptible to more than one interpretation, does not require a holding that the statute is unconstitutional if, as the circuit court determined, those who are affected by the statute can reasonably understand what the statute requires of them. Although LFUCG contends that it was required to "guess" at the statute's meaning, it nevertheless argues that it managed to comply with the statute's directives for over twenty years without event. Accordingly, we agree with the circuit court and hold that the statute does not offend the void for vagueness doctrine.

■ We now turn to the merits of the issues raised by the appellants where we are guided by several settled principles of statutory construction. The cardinal rule for this Court to follow in interpreting statutes is to "ascertain and give effect to the intention of the Legislature...." *Moore v. Alsmiller,* 289 Ky. 682, 686–687, 160 S.W.2d 10, 12 (1942). The intention "must be determined from the language of the statute itself if possible." *Id.* "In construing a statute, the courts must consider 'the intended purpose of the statute—the reason and spirit of the statute—and the mischief intended to be remedied.'" *Commonwealth v. Kash,* Ky.App., 967 S.W.2d 37, 43–44 (1997), *quoting City of Louisville v. Helman,* Ky., 253 S.W.2d 598, 600 (1952). "[A]n overriding rule of statutory

construction is that the manifest intent of the legislature will prevail over the literal import of the words." *Overnite Transportation Company v. Gaddis,* Ky.App., 793 S.W.2d 129, 131 (1990). With these legal principles in mind, it is our belief that the trial court's interpretation of KRS 67A.520 is the one which best effectuates the intention and purpose of the statute.

It is abundantly clear that the General Assembly intended to create a scheme that would fulfill its stated purpose, that is to enable urban-county governments to encourage "qualified personnel to enter and remain" in essential service positions with the police and fire departments. *See* note 1, p. 2 *supra; see also Board of Trustees of the Policemen's & Firefighters Retirement Fund of Lexington–Fayette Urban County Government v. Brown,* Ky.App., 665 S.W.2d 924, 926 (1983). There is no question that the Legislature desired that the pension funds created under this statutory scheme would be actuarially sound, that is, funded at a level sufficient to provide future benefits. This is evinced from the reference to the specific funding methods to be employed, as well as the authority given to the Board to "employ actuarial assistance" specifically for the purpose of "determin[ing] rates of city contribution". KRS 67A.560(6). Having reviewed the depositions of the actuaries in the record, we agree with the appellants that the Legislature contemplated that LFUCG would contribute an annual sum to the fund which, when added to the contributions made by employees and other earnings of the fund, would be sufficient to pay the current service cost—that is, the current value of the benefits being earned over the next year—and the interest on the unfunded past service liability.

However, before this obligation is imposed on LFUCG, KRS 67A.520(1) plainly makes it the responsibility of the Board of Trustees to determine the "rate percent of salaries of active members" that will achieve this level of funding. The appellants argue that "[t]he 'rate percent' as referred to [in KRS 67A.520(1)] has absolutely nothing to do with the annual contribution rate required by [LF]UCG." They further insist that the statute "does not require the Board to formally adopt the contribution rate established by the actuary" in determining the annual contribution. Nevertheless, the statute very plainly states that the Board of Trustees is the entity which must establish, with the aid of the required actuarial studies, the percentage or rate of salaries that LFUCG must contribute.[6]

It is obvious to this Court that the Legislature anticipated that the Board of Trustees might fail to set a rate to be paid by the urban-county government, or that the rate established might be insufficient to adequately insure the fund's soundness. For this reason, subsection (3) of the statute provides for a minimum rate or percent of salaries that LFUCG must contribute to the fund. If the appellants are not satisfied that the minimum funding is sufficient to insure the integrity of their fund, their remedy is to either convince the Board of Trustees to set a higher rate, or to ask the Legislature to increase the minimum rate as it has already done twice in the past. *See* note 5, *supra.*

The appellants suggest that since a majority of the Board of Trustees is comprised of members who are either "employed or elected to represent [LF]UCG's interests," that its failure to heed the advice of its actuaries and set what the ap-

---

6. This scheme is very similar to that provided in KRS 61.565 providing for the employers' contribution to the Kentucky Employees Retirement System (KERS). That statute provides, as does KRS 67A.520, for the employer to contribute current service costs ("normal contribution") at a rate using the "entry age normal cost funding method" to be "deter- mined on actuarial bases adopted by the board." The major difference between the two schemes is that KRS 61.565 provides for the amortization of the unfunded liability of the KERS over thirty years, whereas KRS 67A.520 provides only for the interest to be paid annually on the unfunded liability of the pension fund.

pellants believe to be an appropriate rate has been a calculated and deliberate decision of the majority of the Board of Trustees to fund other government projects at the expense of the fund. Nevertheless, it is not within the authority of this Court to change the make-up of the Board of Trustees, or to interpret the statute in such a way as to eliminate the responsibility of the Board of Trustees to establish the government's contribution rate.

Accordingly, the circuit court's determination that LFUCG has complied with KRS 67A.520, by paying the minimum rate provided for therein, in the absence of any other rate set by the Board of Trustees, is affirmed.

ALL CONCUR.