Nathaniel WOOD, Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 2003–SC–0535–MR.

Supreme Court of Kentucky.

Nov. 23, 2005.

As Modified Dec. 1, 2005.

504

Emily Holt Rhorer, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Tami Allen Stetler, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

JOHNSTONE, Justice.

Following a jury trial, Appellant, Nathaniel Wood, was convicted of capital

murder, capital kidnapping, kidnapping, first-degree criminal trespass, second-degree assault, and violation of a protective order. The Barren Circuit Court sentenced him to the following: life without the benefit of parole for the capital murder and capital kidnapping charges, twenty years for the kidnapping charge, twelve months for the trespass charge, five years for the assault charge, and twelve months for violation of the protective order. He appeals to this Court as a matter of right, raising nine issues for review. For the reasons set forth herein, we affirm.

**Facts**

On December 29, 2000, Wood assaulted his ex-girlfriend, Anna Jones, in her house. A hospital examination revealed that she had suffered bruising to her ribs and a cut lip. Later that same day, Ms. Jones petitioned the district court for an emergency protective order (EPO). The court issued the order and scheduled an EPO hearing for January 8, 2001. Additionally, criminal charges were brought against Wood based on the assault at Jones's home, including a charge of assault in the fourth degree. He was arrested and released on December 29. As a condition of his bond, he was ordered to have no contact with Ms. Jones and to refrain from any communication with her, either directly or indirectly.

Some days later, on January 3, 2001, Wood encountered Ms. Jones as she was driving on Broadway Street in Glasgow. Ms. Jones's friend, Fred Tisdale, was a passenger in her vehicle. Wood cut off her vehicle at an approximate forty-five degree angle, effectively blocking her path. According to Mr. Tisdale's testimony, Wood exited his vehicle and started to yell and waive a handgun while approaching Ms. Jones's vehicle. Wood then fired the weapon through the driver's side window; Ms. Jones was shot and went silent. Mr. Tisdale, trapped because the passenger door was jammed, used the butt of his own gun to escape out of the driver's side window. When he escaped, he found Wood crouched by the driver's side rear door with his gun drawn. A struggle ensued, during which Mr. Tisdale was shot in the forearm as Wood attempted to pull Ms. Jones from the vehicle. Also, at some point during the altercation, Wood was shot once in the leg and twice in the abdomen.

Mr. Tisdale, believing that Ms. Jones was dead and fearing for his own life, ran to a nearby office to summon help. Meanwhile, Wood succeeded in removing Ms. Jones from the driver's seat and pulling her into his own vehicle. He drove away with her legs hanging out of the back driver's side door and dragging on the ground. Responding to several 911 calls from the numerous bystanders who had witnessed this scene, law enforcement vehicles began pursuing Wood. Eventually, he pulled into the yard of Ms. Burldean Summers and ran into the home, leaving Ms. Jones's limp body in his vehicle, her feet still hanging out of the back door. Ms. Summers apparently thought Wood had been in some kind of accident because he was bleeding, and showed him to the bathroom. When the police arrived, though, Wood grabbed Ms. Summers and locked both of them in a spare bedroom. They remained barricaded in the home until police negotiated Ms. Summers' release three hours later. The standoff with Wood continued through the night and into the next day, whereupon the police began pumping gas into Ms. Summers' home to force Wood's exit. Finally, over twenty-four hours after he had arrived at the house, the police were able to enter the house and Woods was physically removed and arrested.

A Barren Circuit Court Grand Jury indicted Wood for capital murder, capital

kidnapping, kidnapping, possession of a handgun by a convicted felon, possession of a firearm by a convicted felon, first-degree burglary, first-degree assault, fourth-degree assault, violation of a protective order, trafficking in marijuana (with a weapon enhancement), and for being a persistent felony offender in the first degree. Following a jury trial, Wood was found guilty of murder, capital kidnapping with respect to Ms. Jones, kidnapping with respect to Ms. Summers, first-degree criminal trespass of Ms. Summers' home, second-degree assault of Mr. Tisdale, and violation of a protective order. He was sentenced as follows: life without the benefit of parole or probation on both the capital murder and capital kidnapping charges, twenty years on the kidnapping charge, twelve months on the first-degree criminal trespass charge, five years for the second-degree assault charge, and twelve months for the violation of a protective order charge. Wood now appeals to this Court as a matter of right, alleging nine trial errors.

**Aggravating Circumstances**

Wood presents five issues for appellate review challenging the aggravating circumstances that were found with respect to the capital kidnapping charge and the murder charge. During the penalty phase of the trial, the jury found the presence of two aggravating circumstances with respect to both the murder and capital kidnapping charges: (1) "Wood has a substantial history of serious assaultive criminal convictions"; (2) "Wood murdered Anna Jones when an Emergency Protective Order or any other order designed to protect Anna Jones from Wood, such as an order issued as a condition on a bond, was in effect." The jury found the presence of an additional aggravating circumstance with respect to only the capital kidnapping charge: "In the course of the commission of the kidnapping, Wood·murdered Anna

Jones." The jury recommended a sentence of life without the benefit of probation or parole for both the capital kidnapping and murder counts, and the trial court adopted these aggravated sentences.

*"Murdered During the Course of a Kidnapping" Aggravator*

■ First, Wood argues that the evidence was insufficient to support the jury's determination that Ms. Jones was murdered during the course of the commission of the kidnapping. According to Wood, she was dead prior to the commencement of the kidnapping. The issue is preserved by Wood's pretrial motion to strike all capital aggravators as to the kidnapping count, which was denied.

The crime of kidnapping is elevated from a Class B felony to a capital offense when the victim is not released alive. KRS 509.040(2). Upon a finding of guilt, the defendant may be sentenced to life without the benefit of probation or parole if at least one statutory aggravating factor is found beyond a reasonable doubt. KRS 532.025(3). KRS 532.025(2) lists certain aggravating circumstances for the jury's consideration; however, this list is not exhaustive. KRS 532.025(2) permits the jury to consider "any mitigating or aggravating circumstances otherwise authorized by law." We have previously held that the fact that a kidnapper murdered the victim during the course of the kidnapping is a proper aggravating circumstance "otherwise authorized by law." *Harris v. Commonwealth*, 793 S.W.2d 802, 805 (Ky.1990).

Wood's primary argument is that there was insufficient evidence to support the jury's finding that Wood murdered Ms. Jones during the course of the kidnapping. Wood argues that the evidence demonstrated that Ms. Jones was dead before he removed her from the vehicle, which is the point at which the kidnapping commenced

(according to the guilt phase instructions). This argument, however, is not germane to the issue of the validity of the aggravating circumstance. Rather, it is a defense to the underlying charge. By finding Wood guilty of kidnapping Ms. Jones, the jury implicitly determined beyond a reasonable doubt that she was alive at the time he took her from her vehicle because one can kidnap only a living person. *See Ernst v. Commonwealth*, 160 S.W.3d 744, 767 (Ky. 2005). ("[W]hen the jury convicted Appellant of kidnapping in the guilt phase, it necessarily found beyond a reasonable doubt that Roberts was alive when Appellant restrained her.... Manifestly, one cannot kidnap a dead body.") Though we need not address the sufficiency of the evidence that Ms. Jones was alive when she was taken to Wood's car, as Wood has not challenged the underlying capital kidnapping charge, suffice it to say that Dr. Corey's testimony that Ms. Jones would not have died instantly provided enough evidence upon which the jury could base its conclusion.

Alternatively, Wood argues that, even if Ms. Jones did die while in Wood's vehicle, she received the fatal injury prior to the kidnapping and therefore, she was not murdered during the kidnapping. According to Wood, such a finding would support the jury's conclusion that Ms. Jones "was not released alive," but would not support the jury's determination that he murdered her during the course of the kidnapping for purposes of the aggravated sentence. Wood's arguments, however, overlook a fundamental principle underlying the concept of murder: the offense is not complete until the victim dies. *Ernst*, 160 S.W.3d at 767. There is no doubt that Ms. Jones was dead by the time Wood arrived at Burldean Summers' house; Dr. Corey, who performed the autopsy, concluded that the wounds to Ms. Jones's feet received in Wood's car were post-mortem.

Furthermore, the police officers that arrived at Ms. Summers' house testified that Ms. Jones was dead in Wood's vehicle when they arrived. Thus, Ms. Jones died while in Wood's vehicle, which even he concedes is a possibility supported by the evidence. Therefore, she was murdered during the course of the kidnapping. We find no error.

*Constitutionality of KRS 532.025(2)(a)(1)*

■ Wood next argues that KRS 532.025(2)(a)(1) is void for vagueness. The issue is preserved by Wood's "Motion to Declare KRS 532.025(1)(a)(1) Unconstitutional." The trial court denied the motion. KRS 532.025(2)(a)(1) permits an aggravated sentence if: "The offense of murder or kidnapping was committed by a person with a prior record of conviction for a capital offense, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions." Wood's central contention is that the statute fails to define "substantial history" and "serious assaultive convictions." He further contends that the impermissibly vague language of the statute fails to put persons on notice of what types of assaultive conduct may later be used against them as an aggravating circumstance.

■ A statute is impermissibly vague if it fails to define a statute with sufficient clarity as to inform ordinary persons as to what conduct is prohibited while also not leading to arbitrary or subjective enforcement. When persons of common intelligence must guess at the meaning of a statute, it is impermissibly vague. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). A statute must be constructed so as to discourage arbitrary or capricious enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). "The

'void-for-vagueness' doctrine, therefore, attempts to ensure fairness by requiring an enactment to provide: (1) 'fair notice' to persons and entities subject to it regarding what conduct it prohibits; and (2) sufficient standards to those charged with enforcing it so as to avoid arbitrary and discriminatory application." *State Board for Elementary & Secondary Education v. Howard*, 834 S.W.2d 657, 662 (Ky.1992). But, that is not to say that a statute must be unduly narrow or specific to pass constitutional muster: "the fact that a statute ... is susceptible to more than one interpretation, does not require a holding that the statute is unconstitutional if ... those who are affected by the statute can reasonably understand what the statute requires of them." *Gurnee v. Lexington–Fayette Urban County Government*, 6 S.W.3d 852, 856 (Ky.1999).

Thus, capital sentencing schemes must satisfy the Eighth and Fourteenth Amendments of the U.S. Constitution by sufficiently channeling and directing the sentencer's discretion so as to minimize the risk of capricious or arbitrary application. *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Clear and objective standards must be in place to provide "specific and detailed" guidance to the sentencer, and to make the process rationally reviewable by an appellate court. 497 U.S. at 774, 110 S.Ct. at 3099. Moreover, a capital sentencing scheme must enable the sentencer to draw distinctions between those defendants who deserve capital punishment versus those that do not; it must genuinely limit the class of persons selected for capital punishment from those that are eligible. "If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Arave v. Creech*, 507 U.S. 463, 474,

113 S.Ct. 1534, 1542, 123 L.Ed.2d 188, 200 (1993).

This is not to say that an aggravating circumstance must be defined with such precision as to render its consideration mathematical. *Walton v. Arizona*, 497 U.S. 639, 655, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990). So long as the statute has some "common-sense core meaning ... that criminal juries are capable of understanding" the aggravating factor is constitutional. *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929, 942 (1976) (White, J., concurring). Furthermore, Kentucky courts have long recognized a presumption of constitutionality. *Commonwealth v. Halsell*, 934 S.W.2d 552, 554 (Ky.1996).

With these principles in mind, we turn to the present matter. Though not binding on this Court, we are mindful of other states' consideration of similar statutory provisions. Wood relies primarily on the Georgia Supreme Court's decision in *Arnold v. State*, which concluded that the following statutory aggravator was unconstitutional: "[T]he offense of murder ... was committed by a person .... who has a substantial history of serious assaultive criminal convictions." 236 Ga. 534, 224 S.E.2d 386 (1976). The Georgia court determined that the language of the statute was too vague to inform the jury as to whether a particular defendant's criminal history constituted a "substantial" history. *Id.* at 542, 224 S.E.2d 386. The Louisiana Supreme Court similarly struck down a provision allowing the death penalty where the defendant has "a significant prior history of criminal activity." *State v. David*, 468 So.2d 1126 (La.1984). The Louisiana Supreme Court reasoned that the language of the statute invited varying interpretations, as the terms "significant" and "prior" are impermissibly vague. Furthermore, the term "criminal activity" did

not satisfactorily limit the number or types of behavior that would fall within the ambit of the statute.

Other courts have reached the opposite conclusion in reviewing statutory aggravating factors similar to that found in KRS 532.025(2)(a)(1). The Pennsylvania Supreme Court considered a slightly different statutory aggravating factor in *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985); the Pennsylvania statute authorized the death penalty if the jury found that the defendant has "a significant history of felony convictions involving the use or threat of violence to the person." This statute was deemed constitutional, primarily because the use of the term "significant" was employed rather than "substantial": "The term 'substantial' is a term connoting quantity.... 'Significant,' on the other hand, conveys not only the concept of numerosity but also 'relevance.'" *Id.* at 853. The Missouri Supreme Court concluded that its statutory aggravating circumstance, directed towards defendants with a "substantial history of serious assaultive convictions," was reasonably clear and therefore constitutional. *State v. Nave*, 694 S.W.2d 729, 738 (Mo.1985). The Missouri Supreme Court was particularly persuaded by the decision of the Nebraska Supreme Court in *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977). In *Holtan*, the court considered the constitutionality of a statutory aggravator directed at persons who have "a substantial history of serious assaultive or terrorizing criminal activity." The court concluded that the terms in the statute have well-fixed meanings and are clearly understood, and accordingly upheld the statute.

We now turn to the present matter. Kentucky's statute requires that the jury determine whether the defendant has a "substantial history of serious assaultive criminal convictions." We believe that this statute sufficiently directs and limits the jury's discretion in finding the presence of this aggravating circumstance so as to avoid arbitrary or capricious application. *See Arave v. Creech*, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). By using the plural of "conviction," the legislature has limited this aggravating factor to those defendants who have at least two prior assaultive convictions. The quantity of convictions to be considered is further limited by the term "substantial." Merriam–Webster defines "substantial" as "ample to satisfy." We believe that the word "substantial" is a term of common understanding, and that the average person or juror comprehends its meaning. Thus, the wording of the statute limits the quantity of prior convictions to be considered.

Furthermore, the character of the prior offenses to consider is sufficiently limited. The statute only contemplates "serious assaultive criminal convictions." Primarily, it limits the jury's deliberations to only such assaultive behavior as resulted in a criminal conviction. *Cf. State v. David*, 468 So.2d 1126 (La.1984) (finding unconstitutional an aggravating factor directed at defendants with a "a significant prior history of criminal activity"). Furthermore, contrary to Wood's assertions, we do not opine that the term "serious assaultive" is overly subjective. Of course, this language invites a certain amount of discretion and necessarily rests on the jury's contemplation as to what constitutes a serious assaultive conviction. However, the fact that a term or phrase invites varying interpretations does not automatically render a statute impermissibly vague. Sentencing schemes are not fixed equations in which the circumstances of a defendant's crimes and facts regarding his or her background are simply plugged in and a sentence is returned. There is a subjective element to every jury decision, start-

ing with a determination of guilt. In fact, it is this very element of subjectivity that prevents the imposition of the death penalty or an aggravated sentence on every defendant that simply has a prior conviction for assault. The phrase "serious assaultive" is a description that lies within the common-sense understanding of the public. We do not believe it is so broad or vague that the common juror could not understand its meaning.

Finally, we note that this aggravating factor satisfies the requirement that the circumstance may not apply to every defendant eligible for the death penalty. Obviously, not every defendant found guilty of capital murder will have at least two prior assaultive criminal convictions. Furthermore, even of those defendants with prior convictions for assault, the jury may not consider this history "substantial" or may not consider the prior criminal convictions to be of a "serious assaultive" quality.

We thus conclude that the language of KRS 532.025(2)(a)(1) is not so broad or vague as to leave the jury unfettered in what it might consider a "substantial history of serious assaultive convictions." Nor is the language so undefined that the jury is left to speculate as to what circumstances would satisfy the aggravating circumstance. The statute limits not only the number of prior convictions that the jury may consider, but also the quality and nature of those convictions. Moreover, the language of the statute is not so inclusive that the circumstance would apply to any death-eligible defendant. We thus affirm the trial court's determination that the statute is constitutional.

■ We likewise reject the companion issue raised by Wood, that the trial court should have directed a verdict on this aggravating circumstance. According to Wood, the trial court should have determined which prior convictions constituted serious assaultive convictions, and presented only these convictions to the jury. The trial court refused, and submitted evidence of all of Wood's nine prior convictions for the jury's consideration. In light of our discussion of the constitutionality of this statute, it should be clear that the question of what constitutes a "substantial history of serious assaultive criminal convictions" is a question for the jury. Wood's suggestion that the trial courts should be charged with the duty of parsing out a defendant's prior assaultive convictions from other convictions is properly directed at the General Assembly, not this Court, as we are not at liberty to insert provisions to or rewrite an otherwise clear and intelligible statute. *See Hatchett v. City of Glasgow*, 340 S.W.2d 248, 251 (Ky.1960). The trial court did not err in submitting evidence of Wood's prior convictions to the jury.

■ Furthermore, the evidence presented by the Commonwealth was sufficient to meet the standard of proof. Wood had previously been convicted of the following crimes that could reasonably have been construed as serious assaultive convictions: seventeen counts of first-degree wanton endangerment, one count of third-degree assault, one count of assault in the first degree under an extreme emotional disturbance, one count of assault in the fourth degree with a knife, another count of assault in the fourth degree, and one count of menacing. This litany of prior assaultive conduct was sufficient to induce a reasonable juror to believe beyond a reasonable doubt that Wood had a "substantial history of serious assaultive criminal convictions" and therefore, a directed verdict on this aggravating circumstance was not warranted. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). Wood's arguments that these prior convictions cannot be considered "serious" go to the weight of the evidence, which is a

question solely within the province of the jury. There was no error.

*Availability of KRS 532.025(2)(a)(1) and KRS 532.025(2)(a)(8) to a Charge other than Murder*

Wood next challenges the availability of the two remaining aggravating circumstances that were applied to the capital kidnapping charge: (1) that Wood murdered Ms. Jones while a protective order was in effect, and (2) that Wood had a substantial history of serious assaultive criminal convictions. According to Wood, the plain language of the subsections dictate that these aggravating circumstances may only be applied to the offense of murder. By Wood's admission, the issue is not preserved but he requests review and relief pursuant to RCr 10.26.

KRS 532.025(2)(a)(1) provides that an aggravated sentence may be imposed if the jury finds beyond a reasonable doubt that "the offense of murder or kidnapping was committed by a person with a prior record of conviction for a capital offense, *or the offense of murder* was committed by a person who has a substantial history of serious assaultive criminal convictions." (Emphasis added). KRS 532.025(2)(a)(8) permits the aggravated sentence where "*the offender murdered the victim* when an emergency protective order or a domestic violence order was in effect, or when any other order designed to protect the victim from the offender, such as an order issued as a condition of a bond ... was in effect." (Emphasis added). In this matter, the jury found the presence of both aggravating circumstances with respect to the capital kidnapping charge. Wood now argues that the plain language of these two provisions evidences the legislature's clear intent that these aggravating circumstances be applied only to the offense of murder.

We cannot address the merits of this argument because it was not presented to the trial court for consideration and therefore is not preserved for appellate review. RCr 10.26 permits this Court to review palpable errors that affect the substantial rights of a party when manifest injustice has resulted from the alleged error. Here, the jury had already found beyond a reasonable doubt that Wood murdered Ms. Jones during the course of the kidnapping; KRS 532.025(3) provides that the aggravated sentence may not be imposed "unless at least one" aggravating circumstance is found beyond a reasonable doubt. Therefore, any alleged error with respect to these two aggravating circumstances is certainly harmless, as the trial court was authorized to impose the aggravated sentence on the basis of the single aggravating circumstance alone. *Soto v. Commonwealth,* 139 S.W.3d 827, 870 (Ky. 2004). Wood urges nonetheless that the jury might have sentenced him differently on the capital kidnapping charge if it had been presented with a single aggravating circumstance, rather than three. An error is non-prejudicial when there is no substantial possibility that the result would have been any different absent the alleged error. *Schoenbachler v. Commonwealth,* 95 S.W.3d 830, 836 (Ky.2003). Here, we find no substantial possibility that the jury would have recommended a different sentence had it only been presented with one aggravating circumstance for consideration. We believe it far more likely that the jury recommended the aggravated sentence due to the particularly brazen and vicious nature of Wood's crimes.

*EPO/ Bond Condition Aggravator*

Wood's third challenge relates to the application of the EPO/bond condition aggravator set forth in KRS 532.025(2)(a)(8). The jury applied this aggravating circumstance to both the capital

kidnapping charge and the murder charge. Wood argues that the EPO was invalid because Ms. Jones lacked standing to seek the EPO against Wood as he is not a "family member" or "member of an unmarried couple" as set forth in KRS 403.725. Further, Wood submits that the use of an EPO as an aggravator generally violates principles of due process because such orders are granted ex parte upon a petitioner's request.

 At the outset, it must be restated that Wood was also ordered to stay away from Ms. Jones as a condition of his bond on the assault charge stemming from his December 29 attack against Ms. Jones in her home. That same day, Wood was arrested and released on the following condition: "stay away from and not communicate with Anna Jones directly or indirectly." Therefore, the jury was entitled to find the presence of this aggravating circumstance regardless of the existence of the EPO, as KRS 532.025(2)(a)(8) also includes "order[s] issued as a condition of a bond." Recognizing this, Wood challenges the validity of the bond condition on two grounds. First, according to Wood, his arguments as to the invalidity of the EPO apply equally to the bond condition because his arrest for assault was based on the same incident alleged in the EPO. Stated otherwise, if the underlying EPO was invalid because it was issued ex parte, the arrest and resulting bond condition—based on the same set of events—is also invalid. This argument seems to overlook a very important distinction between an EPO and a bond condition—while an EPO may be issued ex parte, a bond condition follows an arrest that is based on probable cause. For that reason, there is simply no merit to this argument. Alternatively, Wood claims that the criminal complaint for the charge was not filed until after Ms. Jones's death and that therefore the bond condition order resulting from the arrest was not effective until the filing date. This assertion is equally meritless. Wood signed the conditional release order on December 29 and was on actual notice of this single condition of his release at that time. Conditions attached to a bond are conditions of *release,* not conditions of the filing of the bond. It would defy common sense and undermine the purpose of a conditional release if those very conditions became effective at the time of filing rather than the time of release. Therefore, because Wood also violated a condition of his bond in murdering Ms. Jones, any alleged error with respect to the EPO is harmless.

Nonetheless, we will briefly address Wood's arguments with respect to the EPO because there is no Kentucky case law dealing directly with the issue. In the recent case of *Gutierrez v. Commonwealth,* we considered a similar argument. 163 S.W.3d 439 (Ky.2005). There, the appellant murdered his wife while a domestic violence order (DVO) was in place. The jury applied the EPO/bond condition aggravator set forth in KRS 532.025(2)(a)(8). The appellant argued that the DVO was invalid, and therefore evidence of its existence was inadmissible to prove the aggravating circumstance. We rejected this argument, reaffirming the principle that, whether a court order is right or wrong, it is the duty of the parties to abide by its mandates so long as it remains in effect. *Id.* at 441. We then held that the "validity of a domestic violence order (DVO) is not a proper subject of inquiry when it is offered as proof of an aggravating circumstance in a capital murder prosecution or to prove the criminal violation of the DVO." *Id.* at 442.

 The reasoning and logic of that holding apply equally to emergency protective orders. We recognize, as Wood

highlights, an important difference between an EPO and a DVO: an EPO is issued ex parte, while a DVO is granted following a hearing at which both parties are present and upon the trial court's finding from the preponderance of the evidence that a threat exists. *See* KRS 403.740; KRS 403.750. This distinction, however, does not compel the conclusion that an EPO violation may not serve as the basis for the aggravating circumstance, simply because the EPO is issued ex parte. An EPO is nonetheless a valid court order and must be obeyed until such time that the court can hear the adverse party, if that party so desires. In fact, KRS 403.745(4) requires that a hearing be held within fourteen days, at which the adverse party may directly challenge the order and argue against imposition of a more permanent domestic violence order. In short, adverse parties to an EPO are not denied due process of the law because they have available to them a route by which to directly challenge the order. As we concluded in *Gutierrez* with respect to a domestic violence order, we herein hold that an appellant may not launch a collateral attack on the validity of an emergency protective order in a subsequent prosecution for violation of that order.

Furthermore, Wood's claim that his due process rights were violated is baseless. Wood had ample means to challenge the EPO; a hearing on the EPO was scheduled in accordance with KRS 403.740(4) at which he could have stated his position, and he was served with the EPO which contained the date of the scheduled hearing. Instead, he chose to murder Ms. Jones prior to the hearing. If Wood was denied the opportunity to challenge the EPO before the issuing court, it was a result of his own actions. There was no error.

## Motion to Change Venue

■ Wood next alleges that he was denied a fair trial when his motion for a change of venue was denied. Wood's main contention is that the community of Glasgow was so saturated with pre-trial publicity of his crimes that it was virtually impossible to empanel a fair and impartial jury. Upon thorough review of the record, we find no indication that the trial court abused its discretion in refusing to change the venue of Wood's trial.

■ Wide discretion is afforded to the trial court in determining a change of venue question. *Hurley v. Commonwealth*, 451 S.W.2d 838 (Ky.1970). In determining the proper venue for a criminal trial, the central concern is necessarily to afford the defendant a fair trial, and a change of venue is appropriate when it appears that the defendant cannot receive a fair trial in the county of prosecution. *Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky.1997). A change of venue may be granted upon a showing that: (a) there has been prejudicial news coverage; (2) the coverage occurred prior to trial; and (3) the effect of the news coverage is "reasonably likely to prevent a fair trial." *Wilson v. Commonwealth*, 836 S.W.2d 872, 888 (Ky.1992). Furthermore, a change of venue may be warranted when prejudice is so pervasive that it may be clearly implied from the totality of the circumstances. *Jacobs v. Commonwealth*, 870 S.W.2d 412, 416 (Ky.1994).

Wood directs our attention to the fact that approximately 95 percent of the members of the jury pool had been exposed to pretrial publicity. Wood's crimes occurred midday on a busy Glasgow street, with over a dozen eyewitnesses. It would naturally follow that media coverage of the events would be extensive. However, the central concern in empanelling a jury is not simply the amount of pretrial publicity,

but whether a fair trial is possible. *See Kordenbrock v. Commonwealth*, 700 S.W.2d 384, 387 (Ky.1985). "[T]he test is whether the jurors have heard something that causes a preconception concerning the defendant." *Bowling*, 942 S.W.2d at 298.

Here, we are more than satisfied that the trial court empanelled a fair and impartial jury, and therefore a change of venue was unnecessary. General voir dire was conducted on 226 persons. Fifty of these people were qualified and questioned further. Voir dire on the issue of pretrial publicity was extensive and thorough. Persons who stated that they had formed an opinion of Wood's guilt or innocence were excused. Additionally, persons who had been exposed to incorrect or overly prejudicial information were excused, as were persons who indicated a high level of exposure to media reports about the case. Of the twenty persons selected for the jury, it is clear that each was impartial and otherwise qualified to serve.

 Though media coverage of the case was a concern, we agree with the trial court's ultimate determination that pretrial publicity would not permeate the entire trial and would not prevent a fair trial. A trial judge's decision regarding the impact of media coverage upon the fairness of a trial must be given deference unless "it appears with reasonable certainty there has been an abuse of discretion." *Claypoole v. Commonwealth*, 355 S.W.2d 652, 653 (Ky.1962). In cases with similar circumstances, we have repeatedly held that a change of venue was not required. *See e.g., Grooms v. Commonwealth*, 756 S.W.2d 131 (Ky.1988) (change of venue not required though overwhelming majority of jury panelists had some knowledge of the case). We find no indication that the trial court in this matter abused its discretion. Reversal is not required.

**Motion for Separate Trials**

 Wood claims that he was denied a fair trial by the court's refusal to sever the trials on the charges of kidnapping, burglary, and assault involving Ms. Summers. As stated above, these crimes occurred when Wood arrived at Ms. Summers' home, after having fled Broadway Street with Ms. Jones in his vehicle. We find no error.

 RCr 9.16 permits a trial court to order separate trials of counts if it appears that the defendant or the Commonwealth will be prejudiced by joinder. Joinder is appropriate if the offenses are closely related in character, circumstances, and time. RCr 6.18; *Cardine v. Commonwealth*, 623 S.W.2d 895 (Ky.1981). "[A] trial court has broad discretion with respect to joinder, and will not be overturned absent a showing of prejudice and clear abuse of discretion." *Rearick v. Commonwealth*, 858 S.W.2d 185, 187 (Ky.1993).

Here, the crimes committed at Ms. Summers' home could not have possibly been more related in character, circumstances, and time to the crimes that occurred against Ms. Jones and Mr. Tisdale. Wood only arrived at Ms. Summers' home because he was attempting to evade the police, who were chasing him for the crimes against Ms. Jones and Mr. Tisdale. Undoubtedly, the crimes against all three victims arose from a single chain of events that happened to involve two physical locations. Furthermore, Wood has failed to demonstrate how he was prejudiced by the trial court's decision. The trial court acted well within its discretion when it denied Wood's motion for separate trials.

**Kidnapping Exemption**

 Wood next argues that the kidnapping exemption found at KRS 509.050 precludes his conviction for the capital kidnapping of Ms. Jones. According to

Wood, the restraint of Ms. Jones did not go beyond that which occurred incidental to her murder, and therefore a capital kidnapping conviction cannot stand. We disagree.

KRS 509.050 provides, in part:

A person may not be convicted of unlawful imprisonment in the first degree, unlawful imprisonment in the second degree, or kidnapping when his criminal purpose is the commission of an offense defined outside this chapter and his interference with the victim's liberty occurs immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose.

 This Court employs a three-prong test to determine when the kidnapping exemption statute applies. *Griffin v. Commonwealth*, 576 S.W.2d 514 (Ky.1978). First, the underlying criminal purpose must be the commission of a crime defined outside of KRS 509. Second, the interference with the victim's liberty must have occurred immediately with or incidental to the commission of the underlying intended crime. Third, the interference with the victim's liberty must not exceed that which is ordinarily incident to the commission of the underlying crime. *Id.* at 516. All three prongs must be satisfied in order for the exemption to apply. Application of the kidnapping exemption statute is determined on a case-by-case basis. *Gilbert v. Commonwealth*, 637 S.W.2d 632, 635 (Ky. 1982). "The purpose of the statute is to prevent misuse of the kidnapping statute to secure greater punitive sanctions for rape, robbery and other offenses which have as an essential or incidental element a restriction of another's liberty." *Id.*

We find that Wood has failed to prove the third prong of this test. When Wood pulled Ms. Jones from her vehicle and forced her into his own, she had already been shot and was seriously wounded. The injury ultimately resulting in her death had been inflicted. It was unnecessary to the commission of murder to pull Ms. Jones into another vehicle and drive some distance away. The interference with her liberty greatly exceeded what was necessary to murder her, and at a great cost. Had she simply been shot and left in her vehicle as Wood drove away, she might have received medical attention. Instead, she expired in the back seat of Wood's car. Having failed to satisfy this prong of the test, we need not address the remaining two prongs. *Griffin*, 576 S.W.2d at 516. The kidnapping exemption statute does not apply in this matter.

**Jury Selection**

 Wood argues that five jurors should have been removed for cause because, for varying reasons, each was unqualified to serve. At trial, Wood challenged all five jurors for cause, and the trial court denied all the motions. As a result, Wood used five peremptory challenges on these jurors. "A person has been denied the number of peremptory challenges allotted to him when forced to use peremptory challenges on jurors who should have been excused for cause." *Thomas v. Commonwealth*, 864 S.W.2d 252, 259 (Ky.1993). Wood maintains that reversal is required.

 The trial court has the opportunity to observe the demeanor of a prospective juror, and therefore is in the best position to interpret the substance and nature of that person's responses to voir dire questioning. For that reason, the decision to exclude a juror for cause, or to refuse to excuse a juror for cause, lies within the sound discretion of the trial court and will be reversed only upon a

showing of an abuse of that discretion. *Grooms v. Commonwealth*, 756 S.W.2d 131, 134 (Ky.1988). The central inquiry is whether a prospective juror can conform his or her views to the requirements of the law, and render a fair and impartial verdict based solely on the evidence presented at trial.

*Juror DD*

Wood argues that Juror DD should have been removed for cause because his responses indicated that he would be unable to consider all possible penalties and mitigation evidence. The statements to which Wood directs our attention, however, are not indicative of the overall tone of Juror DD's answers and are misleading because the responses are couched in hypothetical terms. While Juror DD did state that he might be skeptical of a claim that one's childhood rearing greatly influences one's adult actions (by reference to the extreme case of Jeffery Dahmer), he also indicated that he would consider all available penalties. Juror DD further indicated that he would follow the court's instructions and consider only the evidence presented at trial. A prospective juror need not be removed for cause simply because he or she expressed reservations about mitigating circumstances, if such person would nonetheless consider the full range of penalties. *Young v. Commonwealth*, 50 S.W.3d 148, 164 (Ky.2001). No error occurred in refusing to excuse Juror DD for cause.

*Juror TB*

Wood claims that Juror TB should have been removed for cause because she went to junior high school with Ms. Jones, and therefore an inherent bias in favor of the Commonwealth existed. We find no indication in the record that Juror TB should have been excused for cause.

While she did attend junior high school with Ms. Jones, she admitted that they were not close friends and did not "run around together" outside of school. She further stated that she had not even seen Ms. Jones in several years. We also note that the trial court questioned this juror extensively about the precise nature of her relationship with the victim, during which Juror TB indicated that she would not have a problem serving on the jury. The relationship between Juror TB and Ms. Jones was remote, and simply insufficient to warrant her removal. *Cf. Copley v. Commonwealth*, 854 S.W.2d 748, 750 (Ky. 1993) (find no error where the trial court refused to remove current co-workers of the victim from the jury panel). There was no error.

*Juror KS*

Wood objects to Juror KS because she indicated that she had some prior knowledge of the crimes and of both Wood and Ms. Jones, which she had obtained through the local media and "gossip." Knowledge of the crimes alone does not automatically require that a juror be excused. *Byrd v. Commonwealth*, 825 S.W.2d 272, 275 (Ky.1992). Juror KS affirmed her ability to be impartial, and repeatedly emphasized that, although she had heard and read about the case, she "was not there" and that she did not "know a whole lot about the case." Wood has failed to direct our attention to any indication that Juror KS's knowledge of the case impaired her impartiality. We find no error.

*Juror DJ*

Wood claims that Juror DJ should have been excused for cause because her responses indicated an inability to consider mitigation evidence, and revealed a "Klu Klux Klan connection." Not responsive to

any direct question from counsel, Juror DJ revealed that her husband had been wrongly accused of being a KKK member. By this revelation, Juror DJ was clearly attempting to emphasize her impartiality by describing how hurtful and difficult these untrue accusations had been for her family in the small town of Glasgow. In discussing the issue, she repeatedly explained that she learned not to judge people until she "knows the facts" and that she does not "judge people on what I hear." Juror DJ also indicated that she has no bias or prejudice against African–Americans. (Wood is African–American). Wood's arguments with respect to this juror lack any merit, and toe the line of propriety. To represent in his brief that Juror DJ has a "Klu Klux Klan connection" is nothing less than a direct mischaracterization of both her responses and the record, and is highly improper. Furthermore, the record does not support Wood's claim that Juror DJ was unable to consider mitigation evidence. There was no error.

*Juror DT*

Wood also challenges Juror DT's ability to consider mitigation evidence. Wood notes that Juror DT said he "might consider" mitigation but claims that he had no interest in mitigation evidence. This claim is simply speculation and contrary to Juror DT's responses. In fact, when asked by defense counsel if family background and the general character of the defendant would impact punishment, Juror DT twice responded that it was "possible." We find no error.

Wood additionally directs our attention to a conversation between the bench and Juror DT following voir dire, at which he revealed that his new job would prevent his ability to serve on the jury. Defense counsel objected, arguing that Wood had used a peremptory challenge to remove

Juror DT when his employment situation warranted removal for cause. This assertion, however, has no merit because the trial court was under no obligation to remove Juror DT for cause because of his job. In fact, the trial court twice clarified for counsel that he would not have removed Juror DT for cause anyway, because he had failed to bring this impairment to the attention of the trial court earlier.

■ We conclude that Wood has failed to provide a satisfactory reason why any of these five prospective jurors should have been removed for cause. When ruling on a challenge for cause, it is the probability of bias or prejudice that is determinative. *Montgomery v. Commonwealth,* 819 S.W.2d 713, 718 (Ky.1991). Reviewing the totality of each prospective juror's responses, we believe that none revealed a probability of bias or prejudice. The trial court did not abuse its discretion in denying these challenges for cause, and reversal is not warranted.

**Conclusion**

For the foregoing reasons, the judgment of the Barren Circuit Court is affirmed.

All concur.