## Waggoner v. Commonwealth.

(Decided June 12, 1934.)

2

W. L. HAMMOND, W. J. STONE, and J. HENRY TAYLOR. for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

Jim Tom Waggoner was charged by an indictment returned by the grand jury of Harlan county with the crime of willful murder, committed by the shooting and killing of Ledger Howard.

On a trial before a jury, a verdict and judgment fixing his punishment at twenty-one years in the state reformatory were entered; from the latter he appeals, complaining of the action of the court permitting the Honorable D. B. Smith to participate with the commonwealth's attorney pro tem. in the prosecution, a statement of a prospective juror while being examined in the presence of the other jurors, the act of the court excusing a juror after she had qualified and before the panel was accepted, also of certain statements of the commonwealth's attorney, the admission of evidence, and one instruction of the court.

By the testimony of persons present at the time of the killing, it is established that, about 8 or 9 o'clock at night, the deceased with his hands on the back of a chair, was observing a game of chess in the Howard Drug Store at Wallins, when Waggoner entered from the street, and, without saying anything to the deceased or any other person, walked hurriedly up to where the deceased was standing and assaulted him with a pistol; the deceased in his defense grabbed Waggoner's hand in which he had the pistol; the barrel pointing upward when it fired, the ball glancing Waggoner's forehead and passing through his cap, knocking it from his head when Howard and Waggoner grappled; Howard fell to the floor, Waggoner on him. In the melee Howard was shot in the hand, through the heart, and twice in the back; and, as Waggoner arose up and was in the act of leaving, he fired another shot in the direction of Howard at which time Howard was lying upon his face with his back toward Waggoner. A large number of witnesses agree on this narration of the tragedy. Waggoner's theory of the case is he was chief of police at Wallins and had been in office for a little better than two months. He saw Howard on the street two or three times before the encounter in the Howard Drug Store. The time next before seeing him in the drug store, he saw Howard and "Dock" standing on the street talking, when he walked up to them, "shook hands with Ledger [Howard] and said: 'You're getting pretty high' and asked 'Dock' to take him in [home]." Howard was drinking at the time. He did not arrest him. He "was a friend to him, liked him and all, didn't want to arrest him, liked all the Howards." He observed Ledger Howard at the time the latter went into the drug store; Howard passed, going "across in front of the drug store from one side of the street over to the other"; "he walked like he was drinking;" "just as he got there he reached back on his hip and got a pistol out of his hip pocket and stuck it down here [indicating under his belt in front]." Waggoner was, at this time, "about thirty or forty feet away." After he saw the pistol, he went to the drug store "because he [Howard] was drunk," and he thought he "would save somebody getting hurt." When he (Waggoner) went in the drug store, Howard "was standing back to the right of the door, facing the door," and as he "stepped in the door [Howard] turned around facing" him, "standing with his hands this way [indicating on his belt]." We use his

own language at this point: "I put my hand on his shoulder and said 'Ledger, give me that pistol.' He said 'Damn you' and jerked his pistol and shot me," "right there in the forehead," "over my left eye." He exhibited the cap as the one thus shot off his head. Continuing in his language: "He fired the first shot and shot me in the forehead, then started to shoot me in the temple and I ducked and he missed me, then we went in and tied up. I shot three shots, that is all the shots I shot;" "he was trying to shoot me in the temple and we tied up;" "scuffled;" "we just scuffled there when I got loose until I could get up, I backed out the door;" "Howard fell and I backed out the door and he was still shooting as I backed out."

The witnesses for the commonwealth declare no shooting was done except by Waggoner; that, after the shooting was over, a pistol was laying near Howard's body; all of its chambers were loaded except one, and it was without a shell. One or more witnesses for the commonwealth testified that Waggoner informed them before he entered the Howard Drug Store he was going to kill Ledger Howard, and others claim that immediately after Howard was killed Waggoner using an epithet declared he had killed him.

With this summary of the evidence we are brought to a consideration of the grounds urged by Waggoner for a reversal.

On an examination of Mr. Blanton touching his qualification as a juror, he was asked if he were related to Park Howard's wife. His answer was, "none that I know of;" "I am not akin to Park Howard."

The relation of a juror by consanguinity or affinity, is, by section 209 of the Criminal Code of Practice, implied bias, and constitutes ground of a challenge. The answers of Blanton, as they appear in the record, do not show any relationship within this Code provision. No error was committed in not sustaining the challenge of Blanton.

Rufus Bowling, on the voir dire examination, responded to a question propounded by the court that, if taken on the jury, he could and would render a verdict on the evidence produced and the instructions given by the court, notwithstanding any rumors he may have heard. The record discloses no actual bias on the part of Bowl-

ing, as it is defined by section 209, Criminal Code of Practice. On his examination, Bowling stated, in the presence of those jurors who had at that time qualified, that he had known Waggoner for several years and a little incident had happened in his store that caused him to hold prejudice against Waggoner. Bowling did not serve as a juror. The accused requested the tentative jury panel be excused because of the statement of Bowling in their hearing. The court inquired of those on the panel at that time if they would permit the statement of Mr. Bowling to influence them in any way in rendering their verdict, or if they knew anything about the incident Bowling had referred to, and if that would affect their verdict. The jurors remained silent, thus indicating a negative answer. Bowling did not detail the facts incident to the happening which he stated prejudiced him against the accused. His mere statement, as it appears in the record, of itself, was insufficient to influence an intelligent juror. And the silence of the jurors was a sufficient response to the question propounded to them by the court to warrant him in overruling the motion to discharge the tentative panel.

While the jury was being impaneled and after a number of jurors had been accepted by both sides, on information of the commonwealth's attorney, the court excused Mrs. Christian from further service as a juror in the case. The panel had not been completed. It was entirely within the discretion of the court to sustain at this point in the impaneling the jury a peremptory challenge of the commonwealth and excuse Mrs. Christian from jury services in the case. Abner Skidmore, while being examined as a juror, stated his wife "was related to Judge Hamp Howard's set of Howards," but he was not related to the Howard family. He voluntarily stated that he was present at a former trial and had heard some of the witnesses testify. He stated, however, he did not remember what he heard or that he had expressed an opinion, but he had no opinion as to the guilt or innocence of Waggoner, and the fact that he had so heard a portion of the evidence would not influence his consideration and verdict in the case; "that really he did not form an opinion from what he had heard." Waggoner requested the court to discharge this juror.

The record shows that Joe Blanton, Rufus Bowling, and Abner Skidmore did not serve on the jury and participate in returning the verdict upon which the

judgment was entered. We are unable to conceive of any ground for believing their examination, in the presence of the tentative panel which was finally accepted and returned the verdict, was in the remotest degree, prejudicial to any right of Waggoner.

Hon. D. B. Smith was the elected and qualified commonwealth's attorney, and, on the calling the case for trial, Waggoner objected to his discharging in the case the duties of the office of the commonwealth's attorney. The court sustained his objection and appointed a commonwealth's attorney pro tem. who assumed charge of the prosecution. Thereafter Smith engaged, under the supervision of the commonwealth's attorney pro tem., in the prosecution of Waggoner. Waggoner objected to his so doing. The court overruled his objection. As a basis of the motion for the removal of Smith from the office of commonwealth's attorney and the appointment of a commonwealth's attorney pro tem., it was claimed that Smith had been employed and participated as an employed attorney in the prosecution of Waggoner at a former trial. The mere fact Smith as employed counsel had prosecuted Waggoner at a former .trial in no way disqualified him as an elected commonwealth's attorney. However, conceding the propriety of the action of the court in not allowing Smith, as commonwealth's attorney, to prosecute Waggoner, it was not within the power of the court thereafter to control the action of Smith as a member of the bar in his relation to the prosecution of Waggoner. It requires an unusual imagination to accept the impression that Smith's connection with the prosecution after the commonwealth's attorney pro tem. assumed charge thereof was prejudicial to the rights of Waggoner. The contention that his action was prejudicial is more fallacious than plausible.

In the preliminary statement to the jury, the Honorable D. B. Smith, acting for the commonwealth, turned to Waggoner and said: "Do you still plead not guilty?" It is argued that this statement conveyed to the minds of the jury that Waggoner had been considering entering a plea of guilty and the statement was highly prejudicial to his substantial rights. We cannot concur in this view. There is no reason justifying the belief that the statement was not made in the utmost good faith. However it may have been made, it was in no way prejudicial to the rights of Waggoner.

Marion Howard, a brother of the deceased, was asked and answered:

"Q. Did Ledger Howard shoot there? A. He did not.

"Q. Was he armed? A. No.

"Q. Did he draw any weapons? A. I did not see him.

"Q. Did you see his pistol after the difficulty? A. I did."

It is insisted that this evidence is incompetent and self-contradictory. The questions called for the witness' knowledge of a part of the res gestæ which was clearly competent, and, if it was "self-contradictory," such merely affected the weight of his testimony, which was favorable to the accused. Also it is contended that certain testimony relative to the identity of the cap introduced as evidence and questions pertaining thereto were improper and apparently conflicting. Such did not render the testimony incompetent, but merely affected its weight, which rested with the jury.

The accused was asked by his counsel whether he had had "any trouble in an official way" with Howard. He was permitted to answer that he had had such trouble. The court refused to permit him to go into details. The ruling of the court was proper. The accused was permitted to detail fully his relations with, and the conduct of, the deceased in his presence on the day of the killing, and, if the questions propounded to him concerning "any trouble in an official way" refered to something that had occurred between Waggoner and the deceased prior to the day of the killing, it would have been improper to permit him to go into the details. It is not conceivable that the ruling of the court in respect to previous "official trouble" he had had, if any, with the deceased, would have benefited his defense, for such testimony would inevitably tend to show a motive on the part of the accused and therefore would have been hurtful to his defense. It is argued that the court erred in refusing to allow Waggoner to state why he did not arrest the deceased for being drunk just prior to the shooting. The record discloses Waggoner's explanation of the reason he did not arrest the deceased for being drunk before he went in the Howard Drug Store. It is mistakenly argued that Wag-

goner was not permitted to say why he went over to the Howard Drug Store, when in fact the record contains his explanation of the reasons for his going to the drug store. Waggoner was asked to narrate to the jury a conversation had by him and Albert Simpson concerning his going to a doctor right after the shooting. Such evidence was not a part of the res gestæ and sheds no light on any issue involved.

We are convinced the court committed no error in the admission or rejection of the evidence.

Instruction No. 5 informed the jury of Waggoner's right to arrest Howard without a warrant and the duty of Howard to submit to the arrest. This instruction directed the jury that, if Howard "was drunk or intoxicated and that he unconcealed a pistol in the presence of Waggoner who was at the time, a policeman of the town of Wallins, then the defendant had the right to arrest Howard without a warrant," etc. The criticism urged against the phraseology of this instruction is the conjunctive "and" is used thus: "Intoxicated and unconcealed a pistol in his presence." Also it is criticized because it failed to inform the jury it was the right of Waggoner, and his duty, to arrest Howard. The giving of this instruction was based entirely upon the testimony of Waggoner, and, in the light of it, it fairly presented his right to self-defense while acting as an officer. Quinn v. Commonwealth, 63 S. W. 792, 23 Ky. Law Rep. 1302; Miller v. Commonwealth, 215 Ky. 819, 287 S. W. 6. We have frequently approved an instruction wherein it was written, "It was the right and duty of an officer without a warrant to arrest an accused for an offense committed in the officer's presence by taking him into custody," etc., but we have never held that it was a reversible error to omit from the instruction that portion which informed the jury as to the duty of the officer. The jury, as reasonable men, would infer from the language of the instruction defining the right of the officer, that the duty accompanied the right to make the arrest. Stevens v. Commonwealth, 124 Ky. 32, 98 S. W. 284, 30 Ky. Law Rep. 290; Smith v. Commonwealth, 176 Ky. 466, 195 S. W. 811.

In Stevens v. Commonwealth, the deceased was drunk and committing a breach of the peace in the officer's presence, when the latter, while endeavoring to arrest him, shot and killed him. On an appeal, the judg-

ment was reversed. An instruction was prepared and directed to be given on a retrial of the case. It is the form of the instruction given in the present case. It directed the jury, "If they believe from the evidence, the deceased was drunk and disorderly in the presence of the appellant, the latter as marshal of the town, had the right to arrest him without a warrant," etc. The conjunctive "and" was there used as here, and the right of the accused to make the arrest was defined without also defining his duty to make the arrest. This form of instruction was approved in Smith v. Commonwealth, supra. On the whole case we find no error in the trial of Waggoner entitling him to a reversal.

Wherefore the judgment is affirmed.