# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: NOVEMBER 2, 2017
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2016-SC-000410-MR

ROBERT MARKHAM TAYLOR          APPELLANT

ON APPEAL FROM FAYETTE CIRCUIT COURT
V.          HONORABLE THOMAS L. CLARK, JUDGE
14-CR-00184-002

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

On June 15, 2016, a Fayette County jury convicted Robert Markham Taylor of Murder, Kidnapping, and Tampering with Physical Evidence. The jury recommended sentences of twenty-two years each for the Murder and Kidnapping charges and five years for Tampering with Physical Evidence, to be served consecutively for a total sentence of forty-nine years. The court sentenced Taylor per the jury's recommendation, and this appeal followed as a matter of right. Having reviewed the arguments of the parties, we affirm the judgment of the Fayette Circuit Court.

# I.  BACKGROUND

On December 20, 2013, Alex Johnson was killed and his body placed in a barrel, which was then left in the Kentucky River near Interstate 75. The last two people to see Johnson alive were Taylor and Timothy Ballard (a.k.a. "Tiny"). What emerged at trial were two conflicting narratives as to the final hours of Johnson's life.

## A.  Ballard's Testimony.

Ballard testified for the Commonwealth[1] that he and Taylor met while working at a bar in Lexington; Ballard worked as a bouncer and Taylor as a bartender. Ballard had also worked for Taylor as a part-time chauffeur. At Taylor's request, Ballard used a borrowed truck to pick up an industrial, fifty-five gallon barrel from Taylor's residence and took it to Taylor's commercial garage. Ballard drove Taylor to Johnson's home the next evening, December 20, 2013, to pick Johnson up and take them both to Trust Lounge, a nightclub in the area.

Johnson sat in the front passenger seat, with Ballard driving and Taylor sitting directly behind Johnson. As Ballard drove away from Johnson's home, Taylor placed Johnson in a choke hold from behind. Taylor pulled Johnson into the backseat and began beating him. Two people called 911, reporting that there was an altercation inside a vehicle on the street where Johnson lived. One reported "bloodcurdling screams" from the vehicle. The same caller

_____

[1] Pursuant to a plea agreement, Ballard entered a guilty plea to Kidnapping and Tampering with Physical Evidence and was, subsequent to Taylor's trial, sentenced to twenty-five years to serve.

2

also reported that the driver was "a big guy" and the two in the back were the ones involved in the fight.

Ballard stopped the vehicle on the street after someone (he could not identify whether it was Taylor or Johnson) said to "stop the car." Taylor got out of the car and Ballard went to see what was happening in the back of the vehicle. Taylor pulled Johnson out of the car and went to the driver's seat. Ballard tried to help Johnson but Johnson hit him so Ballard proceeded to punch him at least twice and forced Johnson back into the vehicle's backseat. Ballard tried to get in the backseat as well but could not fit. [2] Taylor began driving away while Ballard's legs were still hanging out of the vehicle.

Taylor pulled into an empty lot on a dead-end street. He got out of the vehicle, went to the backseat, and began hitting Johnson once more. When Taylor finally stopped hitting Johnson, he returned to the passenger seat and Ballard drove them away. Ballard heard Johnson's last gurgling breath as they left the lot.

Ballard drove the car to Taylor's garage, and the two men placed Johnson's body in the barrel. Using the borrowed truck, Ballard took the body to the Kentucky River and let it roll in from the truck bed. Taylor cleaned up the vehicle they'd used that evening while Ballard was gone. Both men then went to Taylor's apartment to change clothes. They went to Johnson's apartment and Taylor recovered approximately $36,000 in cash, twenty-six

---

[2] At the time of the murder, Ballard was six-foot-five inches tall and weighed four hundred twenty-five pounds.

pounds of marijuana, and some psilocybin mushrooms. Taylor divided the money with Ballard.

Ballard drove them to Trust Lounge, where Taylor socialized, danced, and mingled for a couple of hours, as seen on Trust's surveillance video. Ballard ultimately confessed on January 20, 2014, after investigators confronted him with cell phone records, surveillance video, and other evidence. He led them to where he had dumped Johnson's body.

**B.     Taylor's Testimony.**

Taylor testified at trial but told a markedly different story. Taylor explained that he had known Johnson because they were both marijuana dealers, and Johnson had been Taylor's supplier. He described Johnson as a good friend who was planning to hand over his drug dealing business to him. Taylor agrees that, on the night of December 20, 2013, Ballard drove them to pick up Johnson at his apartment to go to Trust but disagrees about what transpired from that point.

Taylor had ingested a hallucinogenic drug known as "Molly," and brought some to share with Johnson that evening. He and Johnson got in the car with Ballard; Ballard was driving, Johnson was in the front passenger seat, and Taylor was in the backseat. Johnson made an off-hand remark to Ballard, something along the lines of "what's up, bitch?" and Ballard immediately began assaulting Johnson while he was still driving the vehicle. Taylor was texting and did not notice what was happening until Ballard had already hit Johnson eight or nine times. Johnson was screaming the entire time of the assault.

4

Ballard stopped the car, went to the passenger seat, and proceeded to hit Johnson until he stopped screaming. He said to Johnson, "I've got witnesses now. I might as well kill you." Johnson was slumped over, partially hanging from the vehicle. Ballard could not get him back into the vehicle so he drove off while Johnson's legs were still hanging outside the car door. Ballard stopped again and Taylor pulled Johnson from the car. Johnson was still breathing and Taylor said they should take Johnson to the hospital. Taylor got into the driver's seat but was disoriented. He turned around and saw that Ballard was on top of Johnson in the back seat, assaulting him again. Taylor heard Ballard choking Johnson to death.

Taylor stopped the car, got out of the vehicle, and tried to get Ballard off Johnson. He hit Ballard maybe fifteen times until Ballard finally released Johnson. Taylor pulled Johnson from the vehicle and tried to resuscitate him but was unsuccessful. Taylor testified that Ballard threatened him; Taylor claims he was highly intoxicated and did not know what to do.

From there, Taylor admitted: he and Ballard took Johnson's body to his garage; put his body in the 55 gallon barrel; and Ballard disposed of the body in the Kentucky River. Taylor admitted to cleaning out his car and having his garage cleaned as well. He also testified that he ingested more Molly that evening, and he and Ballard went to Trust, where he socialized, drank, and danced.

It is undisputed that Taylor was arrested in Texas, approximately two miles from the Mexican border on January 22, 2014. He had in his possession

5

about $10,000 in cash, about two pounds of marijuana, three cell phones, clothing, two handguns, ammunition, and copies of two books, *The Prince* and *The Smuggler's Ghost: when marijuana turned a Florida Teen into a millionaire fugitive.*

In this appeal, Taylor asserts that the trial court erred by: not finding that his case was subject to the kidnapping exemption of Kentucky Revised Statute (KRS) 509.050; admitting several pieces of evidence contrary to Kentucky Rules of Evidence (KRE) 403 and 404(b); admitting text messages and video that had not been properly authenticated; refusing to allow a doctor to testify about a mental health evaluation of Ballard; and refusing to designate a particular juror as the alternate. We address each of these issues below and relate further background as necessary.

## II. ANALYSIS

### A. Taylor was not entitled to the kidnapping exemption.

KRS 509.050 states:

> A person may not be convicted of... kidnapping when his criminal purpose is the commission of an offense defined outside this chapter and his interference with the victim's liberty occurs immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose.

When determining the applicability of the kidnapping exemption, "[t]his Court employs a three-prong test." *Wood v. Commonwealth*, 178 S.W.3d 500, 515 (Ky. 2005) (citing *Griffin v. Commonwealth*, 576 S.W.2d 514 (Ky. 1978)).

> First, the underlying criminal purpose must be the commission of a crime defined outside of KRS 509. Second,

6

the interference with the victim's liberty must have occurred immediately with or incidental to the commission of the underlying intended crime. Third, the interference with the victim's liberty must not exceed that which is ordinarily incident to the commission of the underlying crime ... All three prongs must be satisfied in order for the exemption to apply.

*Id.* (internal citations omitted). "The applicability of the... statute is determined as a matter of law." *Arnold v. Commonwealth*, 192 S.W.3d 420, 426 (Ky. 2006) (citing *Calloway v. Commonwealth*, 550 S.W.2d 501, 502-03 (Ky. 1977)). This Court has also held that "[t]he kidnapping exemption statute is to be strictly construed and the burden is upon a defendant to show that it should apply." *Arnold*, 192 S.W.3d at 326 (quoting *Murphy v. Commonwealth*, 50 S.W.3d 173, 180 (Ky. 2001)). "The trial court's decision will not be disturbed unless there is an abuse of discretion." *Arnold*, 192 S.W.3d at 326 (quoting *Murphy*, 50 S.W.3d at 180).

The Commonwealth has conceded that Taylor met his burden in showing that the first and second elements in this three-prong test are met. Thus, the only point of contention between the parties is whether the third element has been met. "Historically, this has been the most important prong of the exemption test." *Stinnett v. Commonwealth*, 364 S.W.3d 70, 78 (Ky. 2011) (internal citations omitted).

"[A] case-by-case analysis is required depending on the specific facts of a given case" in determining the applicability of the exemption. *Id.* at 77 (citing *Gilbert v. Commonwealth*, 637 S.W.2d 632, 635 (Ky. 1982)). In *Wood v. Commonwealth*, the defendant began his assault of his victim on the street,

7

while the victim was in a vehicle with a friend. 178 S.W.3d at 505. Wood shot the victim and a struggle ensued. *Id.* Ultimately, the friend fled to find help. *Id.* Wood removed the victim from the vehicle and put her into his car and "drove away with her legs hanging out of the back driver's side door and dragging on the ground." *Id.* He stopped in a residential yard and, after a hostage situation with the homeowner, was arrested. *Id.* Medical evidence established that the victim died en route to this residential yard. *See id.* at 507. This Court held that "[t]he injury ultimately resulting in [the victim's] death had been inflicted. It was unnecessary to the commission of murder to pull [the victim] into another vehicle and drive some distance away." *Id.* at 515. "The interference with her liberty greatly exceeded what was necessary to murder her, and at a great cost." *Id.* Instead of being given an opportunity to "receive[] medical attention...she expired in the back seat of Wood's car." *Id.*

Ballard testified that he and Taylor drove Johnson to the empty lot where Taylor continued to beat Johnson, and then they drove away from that location and Johnson gave his last "gurgling" breath. According to Ballard, he and Taylor kept Johnson captive after the assault ended, but before Johnson's death. Even Taylor admits that they forced Johnson back into the vehicle two separate times before Johnson finally succumbed to his injuries.

Like *Wood*, this restraint was unnecessary to the completion of the murder and exceeded what was necessary to complete the underlying offense. Like in *Wood*, Ballard and Taylor could have left Johnson on the street or in the empty lot where he was beaten. But according to both Ballard's and

8

Taylor's testimony, they put Johnson back into the car and took him away from the lot. Both men testified that it was after this point that Johnson ultimately died.

The exemption must be narrowly construed. *See Arnold*, 192 S.W.3d at 326 (quoting *Murphy*, 50 S.W.3d at 180). Under these facts, and narrowly construing the exemption as we must, the trial court did not abuse its discretion in refusing to apply the kidnapping exemption.

Taylor also claims error in the trial court providing an instruction on kidnapping to the jury because the kidnapping exemption applied. Because we hold that the trial court correctly found that the exemption did not apply, we discern no error in the court's instruction on kidnapping.

**B.      The trial court did not abuse its discretion under KRE 403 or 404(b).**

On appeal, Taylor argues that the cell data and text messages, testimony about and video of Taylor at Trust Lounge after the murder, evidence of guns, books, and designer clothing found in Taylor's possession when he was arrested, and the barrel in which Taylor and Ballard placed Johnson's body were admitted in violation of KRE 403 and/or KRE 404(b). We perceive no reversible error in the admission of this evidence.

Under KRE 401, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. "This standard is powerfully inclusionary and is met upon a showing of minimal probativeness." *Roe v. Commonwealth*, 493 S.W.3d 814, 820 (Ky.

9

2015) (internal citations omitted). However, even though "relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

KRE 404(b) also limits admission of "[e]vidence of other crimes, wrongs, or acts," stating that it "is not admissible to prove the character of a person in order to show action in conformity therewith." However, the rule does allow admission of the evidence "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b). "For such evidence to be admissible, however, it must be relevant for at least one of these other purposes, and its probative value on that issue must exceed the prejudicial effect of its character-proving aspects." *Dickerson v. Commonwealth*, 486 S.W.3d 310, 320 (Ky. 2016) (citing *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994)).

The trial court's decisions in these areas are granted "broad discretion" and these decisions should only be reversed "where there has been clear abuse of discretion." *Page v. Commonwealth*, 149 S.W.3d 416, 420 (Ky. 2004) (citing *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky. 1996)). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Webb v. Commonwealth*, 387 S.W.3d 319, 324 (Ky. 2012) (quoting *Anderson v.*

10

*Commonwealth*, 231 S.W.2d 117, 119 (Ky. 2007) (citing *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)).

With the preceding in mind, we now address each of Taylor's arguments.

### 1.   Cell Data and Text Messages

The Commonwealth's theory of the case was that Taylor killed Johnson to take over Johnson's drug business. Detective Joe Sisson testified for the Commonwealth for three hours about Taylor's and Ballard's cellphone data and text messages. The text messages were, in large part, messages between Taylor and his customers and were offered to prove Taylor's existing marijuana dealing business. The Commonwealth argued these messages and cell phone activity proved: the existence of Taylor's business, providing the motive for killing Johnson; described the car in which Taylor was apprehended; and, through messages and calls from Taylor to Johnson after Johnson's death, proved Taylor's intent to cover up his crime.

The first determination to be made is whether this evidence is relevant. "[R]elevance is established by any showing of probativeness, however slight." *Webb*, 387 S.W.3d at 325 (quoting *Springer v. Commonwealth*, 998 S.W.2d 439, 449 (Ky. 1999)). The evidence is clearly relevant. It ties Taylor to the getaway vehicle. It provides the motive for the killing. It establishes how Taylor and Johnson knew each other, as well as Ballard's involvement. Thus, the evidence meets this "slight" showing to pass muster under KRE 401.

The next, and more challenging, determination is whether, under KRE 403, probativeness of the evidence outweighed its prejudice. At the outset, we

11

must reiterate that KRE 403 "does not offer protection against evidence that is merely prejudicial in the sense that it is detrimental to a party's case." *Webb*, 387 S.W.3d at 326 (citing *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980); *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 427 (5th Cir. 2006)). Instead, the evidence must be unduly prejudicial, which occurs when it "'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Carter*, 617 F.2d at 972 (quoting 1 J. Weinstein & M. Berger, *Weinstein's Evidence* P 403(03), at 403-15 to 403-17 (1978)).

Taylor argues first that, "[b]eing forced to listen to three hours of barely relevant cell phone data and text messages necessarily provoked the jury's instinct to punish *someone*." The brunt of this argument is that being forced to listen to evidence somehow created a sense of ire intense enough to force the jury to lash out at and punish Taylor. Under the facts of this case, this Court is disinclined to succumb to the cynicism of this argument. The evidence may have been monotonous; however, there is nothing else in the record to prove that the mere amount of evidence alone created undue prejudice.[3]

---

[3] We are also unpersuaded by Taylor's argument that jurors falling asleep leads to the conclusion of undue prejudice. If anything, we find this shows the evidence did *not* "arouse [the jury's] sense of horror, provoke[] its instinct to punish," or otherwise cause it to act contrary to law. *See Carter*, 617 F.2d at 972 (quoting 1 J. Weinstein & M. Berger, *Weinstein's Evidence* P 403(03), at 403-15 to 403-17 (1978)).

12

Taylor also argues that the unduly prejudicial impact should be inferred due to the jury's recommendation of two twenty-two year terms, to be served consecutively. However, the distinction between the case cited by Taylor to support this proposition and his own case is significant. In the case cited by Taylor, the defendant was sentenced to the maximum allowable penalty. *See* *Cargill v. Commonwealth*, 528 S.W.2d 735, 737 (Ky. 1975). In fact, the Court specifically stated that "[p]rejudice may be inferred from the fact that Cargill received the *maximum penalty* on the charges of robbery, as well as the drug charge." *Id* (emphasis added). Here, Taylor was sentenced to only two years more than the minimum sentence on each charge. This distinction is paramount. Thus, we are unpersuaded to find prejudice from the jury's sentence.

Finally, Taylor argues that this particular evidence should have been excluded under KRE 611(a). The Court is similarly unpersuaded by this method of attack. There is no evidence in the record that the court failed to "exercise reasonable control" over the presentation of the case, as required by KRE 611. The judge exercised his discretion in determining the probativeness of the Commonwealth's evidence, determined this probativeness outweighed any prejudice, and found that the method of its presentation was appropriate. Thus, the trial court did not abuse its discretion.

## 2. Drug Dealing

Most of the aforementioned cell phone evidence related to Taylor's drug dealing. Thus, Taylor also argues that the admission of this evidence violated

13

KRE 404(b). KRE 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ... ." However, if provided for a permissible non-character purpose, the evidence may be admissible. *See Dickerson*, 486 S.W.3d at 320 (citing *Bell*, 875 S.W.2d at 889). Additionally, the probativeness of such non-character evidence of other crimes, wrongs, or acts must "exceed" its prejudicial value. *Dickerson*, 486 S.W.3d at 320 (citing *Bell*, 875 S.W.2d at 889). We note that Taylor's counsel spoke of his drug dealing during opening statements and Taylor openly discussed his business and use of drugs while testifying on direct examination. Therefore, he also presented this evidence as part of his strategy at trial. Whatever strategy may have been utilized, it is disingenuous for Taylor to now complain that he was prejudiced by evidence of his drug dealing when he also used it at length in the presentation of his case. However, in spite of this flaw, we still hold that the trial court's admission of this evidence was not an abuse of discretion.

Initially, this Court must find that the drug dealing is evidence of "other crimes, wrongs, or acts" under KRE 404(b). However, we find our prior decision in *White v. Commonwealth*, 178 S.W.3d 470 (Ky. 2005) most instructive in comparison. In *White*, the defendant plotted with two others to murder the sheriff. *Id.* at 473-75. Part of his motive was to install a new sheriff who would allow White's drug business to flourish. *See id.* As such, the Commonwealth introduced "extensive testimony" about White's drug dealing.

14

*Id.* at 475. This Court held that the evidence was admissible under the motive exception of KRE 404(b). *Id.* at 476.

In response to White's argument that the presentation of evidence was too extensive and cumulative for its offered purpose, the Court stated that White "was not on trial for a lesser crime... he had been indicted for a *capital offense.*" *Id.* at 477 (emphasis original). As such, "it was necessary that the prosecutor prove that [White]'s motive was correspondingly serious." *Id.* "Such cumulative evidence was necessary to establish that [White] was far more than a casual seller, thus lending credence to the idea that he would seek to kill in order to maintain his business." *Id.* at 478. This Court also felt that even though the evidence was "voluminous," "it was not the sort of outrageous crime ... that would almost inevitably inflame a jury's passion." *Id.* Testimony showed that White sold cocaine, methamphetamine, and other prescription drugs. *See id.* at 477.

Taylor's drug business was the main motive behind Johnson's murder, evidence of which was far less prejudicial than the evidence regarding White's business. White sold numerous drugs, possession of most of which would be a felony. Taylor was selling marijuana, a drug now legal in some states. Additionally, as in *White*, use of this evidence proved motive to *kill*. This requires an extensive showing as to what would prompt Taylor to violently attack and kill a man he called a friend. As such, the extensive evidence showing Taylor's business and reliance upon that business. Finding it's prejudicial nature low, and its probativeness high, this evidence was properly

15

admitted under KRE 404(b). We find no abuse of discretion in the admission of cell phone data, text messages, and testimony concerning Taylor's drug business, under either KRE 403 or 404(b).

### 3. Testimony about and video of Taylor at Trust Lounge

As this issue was not fully preserved, Taylor requests a palpable error review under Kentucky Rule of Criminal Procedure (RCr) 10.26. Under this standard, "[w]e will reverse... only when a 'manifest injustice has resulted from the error.'" *Baumia v. Commonwealth*, 402 S.W.3d 530, 542 (Ky. 2013). "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Id.* (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006)). The "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Baumia*, 402 S.W.3d at 542 (quoting *Martin*, 207 S.W.3d at 3).

The Commonwealth presented video surveillance of Taylor at Trust Lounge after the murder occurred, showing him dancing, drinking, and interacting with friends while Ballard stands nearby. The Commonwealth used the video on three separate occasions: during testimony from Trust Lounge's general manager; during cross-examination of Taylor; and in closing. The entirety of Taylor's defense was that Ballard committed the murder and he was merely an innocent bystander who only took part in the cover-up. This defense made the video from Trust relevant because it showed Taylor's conduct after this alleged trauma and the dynamic between Taylor and Ballard. Although

16

this Court would agree with Taylor that "partying" behavior is not evidence of guilt, it is evidence that tends to refute Taylor's claim that he was merely Ballard's victim, and had undergone a severe trauma when he saw his friend violently attacked and killed. Since the evidence has some tendency to prove Taylor's guilt, it is relevant under KRE 401.

Furthermore, the evidence was probative because it tended to refute Taylor's alternative perpetrator theory. Therefore, this Court cannot say that there was any undue prejudice from this evidence; nor can we say that any undue prejudice outweighed the relatively high probative value of the evidence. The trial judge did not abuse his discretion, and we do not find palpable error in the admission of this evidence.

Finally, Taylor argues that the Commonwealth submitted this evidence solely to prove his bad character in violation of KRE 404(b). However, the evidence presented of Taylor's behavior at Trust after the murder falls outside the purview of KRE 404(b). Dancing, drinking, and socializing at a nightclub is not inherently criminal nor inherently indicative of bad character. Thus, it cannot be considered evidence of "other crimes, wrongs, or acts." Any undue prejudice certainly did not outweigh the probative value.

**4. Guns, Books, and Designer Clothing**

Taylor next contends that admission of photographs showing several items in his possession at the time of his arrest was an abuse of discretion. The relevant items are: two books – *The Prince* by Machiavelli; *The Smuggler's Ghost, when marijuana turned a Florida Teen into a millionaire fugitive, a true*

17

*story,* designer clothing, and handguns. These items were found in Taylor's possession when he was arrested two miles from the Mexico border. Taylor does not dispute that he was fleeing to Mexico. The Commonwealth argued that this flight showed Taylor's guilt.

Evidence of "flight is always some evidence of a sense of guilt." *Rodriguez v. Commonwealth,* 107 S.W.3d 215, 218-19 (Ky. 2003) (quoting *Hord v. Commonwealth,* 13 S.W.2d 244, 246 (Ky. 1928) (other citations omitted)). The collection of items with Taylor showed his intent to create a new life of crime in Mexico as an attempt to flee any consequences from his crime. As such, it shows evidence of guilt and is relevant.

However, Taylor has failed to show the inherent prejudicial nature of these items. Taylor argues the admission was "pure character assassination" but it is beyond this Court how possession of designer clothing, books, and even handguns can be so unduly prejudicial. As such, we cannot say that the prejudice outweighs the probative value.

Taylor also implies the admission of this evidence contravenes KRE 404(b). This Court is also unwilling to characterize the possession of these items as "[e]vidence of other *crimes, wrongs, or acts*" under KRE 404(b) (emphasis added), as Taylor urges. Possession of a book, designer clothing, and a gun is not inherently criminal. We are not persuaded to extend KRE 404(b)'s reach to these items.

18

## 5.    The 55 Gallon Barrel

Taylor concedes that this issue is also unpreserved and subject to palpable error review. At trial, the Commonwealth introduced the actual barrel which had been used to hide and dispose of Johnson's body after his murder. Taylor argues that admission of this evidence was unnecessary as photographs, videos, and testimony provided a description of the barrel and explanation of its use. However, the test for admission is not whether the evidence was *necessary* but whether it was relevant.

The barrel is relevant to the Commonwealth's case, especially since Taylor was also being prosecuted for Tampering with Physical Evidence. The barrel is probative of Taylor and Ballard's attempt to conceal the body and hide the evidence of their crime. It is akin to a murder weapon which is relevant to the case, even if there are photographs and testimonial descriptions of it. "[T]he prosecution is permitted to prove its case by competent evidence of its own choosing, and ... the defendant may not stipulate away parts of the case that he does not want the jury to see." *Page*, 149 S.W.3d at 420. The barrel is probative of Taylor's planning of the crime and the concealment of any evidence. As such, we cannot see that any undue prejudice would outweigh this probativeness. This is not like our precedents involving grotesque photographs or autopsy videos and details. This was a barrel that had *previously* been used to dispose of a body. Taylor argues that there may have been a stench from the barrel or the barrel may have been in front of the jury for an extended period of time. There is no evidence that the barrel was

19

grotesque or altered in any way to enhance its prejudicial nature. Taylor's arguments are pure speculation. We cannot hold that the trial judge abused his discretion in allowing the Commonwealth to present this evidence.

**C.   The text messages and video evidence were properly authenticated.**

Taylor alleges that the text messages from Taylor's and Ballard's cell phones and surveillance videos from three separate locations were not properly authenticated. We begin our analysis by noting that questions of authentication are reviewed under an abuse of discretion standard. *Johnson v. Commonwealth*, 134 S.W.3d 563, 566 (Ky. 2004) (internal citations omitted).

KRE 901(a) requires "authentication or identification as a condition precedent to admissibility" which "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This burden "is slight, which requires only a prima facie showing of authenticity to the trial court." *Johnson*, 134 S.W.3d at 566 (citing *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994)).

**1.   Cell Phone Messages**

Det. Sisson testified that he had training in computer forensics, and specific training in cell phone technology. He testified he obtained the contents of Taylor's cell phone through the use of a program called Cellbrite. Det. Sisson testified that Cellbrite pulls information from a cell phone in a readable format for investigators. He testified that the report was a fair and accurate depiction of the download created. This is sufficient for authentication purposes to prove that the item in question is what it is purported to be: a

20

generated report, showing the contents of Taylor's cell phone. It is important to note that the report itself was introduced without objection.

Taylor argues *briefly* that these messages included hearsay. He is correct. However, this issue is not properly preserved. Although defense counsel objected to these messages as hearsay during trial, the judge failed to make a specific ruling on the hearsay objection. He overruled the objection, finding that the evidence was relevant and a proper foundation had been laid, but he failed to make a ruling on hearsay. Defense counsel did not raise the hearsay issue again. "[I]f an objection is made, the party making the objection must insist that the trial court rule on the objection, or else it is waived." *Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky. 1971) (citing *Simmons v. Commonwealth*, 269 S.W. 732 (Ky. 1925) and *Harris v. Commonwealth*, 342 S.W.2d 535 (Ky. 1961)). This issue was, therefore, waived, as defense counsel failed to request a ruling on the hearsay objection.

Even if the issue had been properly preserved, the error in admitting this hearsay was harmless. "A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688-89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). The cell phone record did contain hearsay evidence of Taylor's drug dealing. However, Taylor's defense raised this fact during opening statement and Taylor testified at length about his drug dealing. The evidence against Taylor was plentiful: an

21

eye witness account the jury deemed credible and corroborating video surveillance. Thus, we deem any error in admitting the cell phone records to be harmless.

We also hold that the surveillance videos were sufficiently authenticated to meet the Commonwealth's burden. The Commonwealth introduced three separate videos: surveillance video from Spare Parts; video from 148 Jefferson Street, showing a view of Taylor's garage; and surveillance from Trust Lounge after Johnson's murder.

**Spare Parts.** Sergeant David Richardson testified that he personally downloaded the Spare Parts surveillance video from the business's system and reviewed said video. An employee of the business confirmed that he assisted in the retrieval of this footage.

**148 Jefferson Street.** Sgt. Richardson also testified that he personally downloaded the video from 148 Jefferson Street, which showed Taylor's garage. The owner of the property testified as to the surveillance system, cameras, and Sgt. Richardson's approved retrieval of the footage.

**Trust Lounge.** Eric Ostrander, general manager of Trust Lounge, testified as to the existence of his surveillance system, where the cameras were located, and that the admitted video was a fair and accurate depiction of the nightclub.

This testimony is sufficient to establish the Commonwealth's prima facie showing that the evidence is what it is purported to be. The defense did not

22

question the actual authenticity of this video. Without more, we cannot say that the judge's decision was an abuse of discretion.

### D. The trial court's exclusion of Ballard's KCPC evaluation was harmless error.

Taylor attempted to call Dr. James Anderson from Kentucky Correctional Psychiatric Center (KCPC) to testify about Ballard's KCPC evaluation and his experience with Ballard. Most of the relevant evidence involved Dr. Anderson's psychiatric diagnoses: malingering and feigning symptoms of post-traumatic stress disorder. The Commonwealth objected, and the trial judge sustained the objection, finding that the evidence was irrelevant as the mental health records did not go to Ballard's memory or ability to recall, and Ballard already admitted that he was a liar.[4] We hold that this evidence should have been admitted, but the error was harmless.

"The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the opportunity to present a full defense, and that guarantee includes the right to introduce evidence that an alternate perpetrator committed the offense." *Gray v. Commonwealth*, 480 S.W.3d 253, 266 (Ky. 2016) (citing *Harris v. Commonwealth*, 134 S.W.3d 603, 608 (Ky. 2004)). Taylor chose to employ the aaltperp theory that Ballard had killed Johnson and wanted to elicit Dr. Anderson's testimony to prove that Ballard was feigning his

---

[4] The Commonwealth argues that the defendant also failed to overcome the psychotherapist-patient privilege in KRE 507(b). The foundation for this argument is unclear in the record but we note that, if Ballard waived his privilege for the purpose of a KCPC evaluation, this privilege would no longer apply. The Commonwealth cannot deny the privilege in assessing competency and criminal responsibility and then claim the privilege on behalf of witnesses it wants to portray as credible.

23

trauma after the murder, in order to show that Ballard was the perpetrator rather than Taylor.

For aaltperp evidence to be admitted, "all KRE 403 requires is evidence of some logical, qualifying information to enhance the proffered evidence beyond speculative, farfetched theories that may potentially confuse the issues or mislead the jury." *Id.* The Commonwealth did not object to Taylor's other aaltperp evidence, including several jailhouse informants who testified that Ballard had confessed to Johnson's murder. Both Taylor and the Commonwealth agree that only two people were present at the time of Johnson's death: Taylor and Ballard. As only those two men knew what really happened that night and each man testified that the other had killed Johnson, Taylor's theory was "more than speculation or exculpatory name-dropping." *Id.*

Under the broad nature of KRE 401 and 403, as we outlined in determining the admissibility of the Commonwealth's evidence, Taylor clearly met his burden for admission of this evidence. But, the judge excluded this evidence based on its inability to question Ballard's memory or ability to recall. Dr. Anderson's testimony did tend to undermine Ballard's credibility generally. But it also went directly to Ballard's guilt, state of mind, and feigning of trauma, thereby lending credence to Taylor's aaltperp theory that Ballard killed Johnson. The gist of Taylor's aaltperp theory was that if Ballard was feigning trauma after the experience, he was not truly traumatized and was lying to conceal his participation in the crime. Therefore, here, the evidence's value went to Taylor's aaltperp theory and the decision to exclude was "unsupported

24

by sound legal principles." *See Webb*, 387 S.W.3d at 324 (internal citations omitted).

However, we also hold that this error was harmless. "Exclusion of evidence that an 'aaltperp' had both the motive and the opportunity to commit the act for which the accused is charged deprives the accused of the Due Process right to present a defense." *Blair v. Commonwealth*, 144 S.W.3d 801, 810 (Ky. 2004) (citing *Beaty v. Commonwealth*, 125 S.W.3d 196, 07-08 (Ky. 2003). "Harmless error analysis applied to a constitutional error ... involves considering the improper evidence in the context of the entire trial and asking whether there is a [']reasonable possibility that the evidence complained of might have contributed to the conviction.[']" *Staples v. Commonwealth*, 454 S.W.3d 803, 826-27 (Ky. 2014) (citing *Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky. 1998) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). "A properly preserved constitutional error is reversible, in other words, unless it was 'harmless beyond a reasonable doubt.'" *Staples*, 454 S.W.3d at 827 (quoting *Chapman*, 386 U.S. at 23).

In this case, the excluded evidence was minimal. Taylor presented vast evidence of his aaltperp theory: several jailhouse informants who testified of Ballard's inculpatory statements and confessions; Taylor's own testimony of what he stated transpired that evening; and cross-examination of Ballard, confessing to his violent history and talent for lying. In light of the weight of this evidence, Dr. Anderson's testimony added little, if any, value to Taylor's aaltperp theory. As such, there is no reasonable possibility that the admission

25

of this evidence would have led to a different verdict, and the error was harmless.

**E.    The trial court did not abuse its discretion in refusing to choose a particular juror as an alternate.**

Defense counsel received juror qualification forms three days before trial and had the opportunity to fully examine potential jurors during *voir dire*. After several days of trial, defense counsel told the Court they had discovered that juror 3251 was married to the public relations officer for the Lexington Fayette Urban County Government, information that the juror disclosed on his jury sheet. Taylor now argues that this juror should have been chosen as the alternate and dismissed, although he has made no specific allegations that this juror lied or deliberately withheld information during *voir dire*.

"The rule is well settled that a challenge to a juror for cause must be made before the trial." *Pelfrey v. Commonwealth*, 842 S.W.2d 524, 526 (Ky. 1992) (citing *Galliaer v. Southern Harlan Coal Co.*, 57 S.W.2d 645 (Ky. 1933)). "All challenges must be made before the juror is sworn. No prospective juror may be challenged after being accepted *unless the court for good cause permits it.*" RCr 9.36 (emphasis added). "[T]he granting of such challenge is permissive. What constitutes 'good cause' and whether the court will permit such challenge are matters within the discretion of the trial court." *Rowe v. Commonwealth*, 394 S.W.2d 751, 753 (Ky. 1965) (quoting *Waggoner v. Commonwealth*, 72 S.W.2d 723 (Ky. 1934)).

26

We have upheld a trial court's discretion in deliberately choosing an alternate juror when circumstances arise that may impugn the integrity of the juror in question. *See Nunley v. Commonwealth*, 393 S.W.3d 9, 14 (Ky. 2013). Although we also acknowledged that "[t]he trial court should err on the side of caution by striking the doubtful juror," *see Nunley*, 393 S.W.3d at 14, we similarly must analyze a judge's decision *not* to deliberately choose an alternate under the same abuse of discretion standard. Both parties had the juror's information before *voir dire*; there is no allegation the juror perjured himself or intentionally misled the jury during *voir dire*; and Taylor has not alleged any specific bias. While we continue to appreciate judges' erring on the side of caution and dismissing jurors for cause when there are questions about a juror's ability to serve, we cannot say the judge's decision *not* to dismiss for cause was an abuse of discretion. The jury had been impaneled; several days of trial had ensued; Taylor did not object to this juror during *voir dire*; and Taylor has failed to articulate any specific prejudice that would have resulted in the juror's dismissal for cause. It is up to the court to determine whether good cause has been shown to allow a for-cause challenge after the jury was impaneled. The judge here decided there was not, and deemed it unnecessary to designate the juror as the alternate. We cannot say this was an abuse of discretion.

## III.  CONCLUSION

Any errors that occurred at trial were harmless.  The evidence against Taylor was ample.  We see no reversible error here.  For the foregoing reasons, we affirm the Fayette Circuit Court.

All sitting.  Minton, C.J.; Hughes, Keller, VanMeter, Venters and Wright, JJ., concur.  Cunningham, J., concurs in result only.

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General